UNITED STATES of America,
Plaintiff–Appellee,

v.

Miguel N. GARCIA and Carl J. McAfee,
Defendants–Appellants.

Nos. 95–4068, 96–1041.

United States Court of Appeals,
Seventh Circuit.

Argued May 16, 1996.

Decided July 10, 1996.

Rodney Cubbie, Pamela Pepper (argued), Office of the United States Attorney, Milwaukee, WI, for the United States.

Catherine M. Canright (argued), Milwaukee, WI, for Miguel N. Garcia.

Martin E. Kohler (argued), John C. Thomure, Jr., Kohler & Hart, Milwaukee, WI, for Carl J. McAfee.

Before POSNER, Chief Judge, ESCHBACH, and ROVNER, Circuit Judges.

ESCHBACH, Circuit Judge.

Carl McAfee pleaded guilty to conspiracy to possess with the intent to distribute more than five kilograms of cocaine. Miguel Garcia, McAfee's co-conspirator, proceeded to trial where he was convicted of the offense to which McAfee pleaded guilty and knowingly and intentionally attempting to possess with the intent to distribute cocaine. McAfee appeals only his sentence. Garcia appeals his convictions and his sentence. Our court consolidated their appeals for disposition. We AFFIRM.

## I.

On March 8, 1995, Vivian Betancourt (hereinafter "Betancourt") was arrested on a marijuana charge. Betancourt agreed to cooperate with the government in exchange for leniency. She promised that she would deliver to the government a cocaine dealer.

On March 14, in cooperation with the government, Betancourt phoned Miguel Garcia. Garcia said that he wanted to buy eight kilograms of cocaine. On June 20, Betancourt called Garcia and told him that her

associates had ten kilograms of cocaine available for purchase. Garcia agreed to buy all ten. Later that day, Betancourt phoned again, saying that she could deliver fifteen kilograms. Garcia said that he only wanted ten, and that he had the money on hand. The next day Betancourt and Garcia met with undercover detectives, posing as drug dealers, in a motel room in Milwaukee, Wisconsin. Garcia told the detectives that he wanted to purchase ten kilograms. Garcia said that he needed to speak with his buyers,[1] and that he would return within the hour to purchase the drugs. Betancourt and Garcia returned to Garcia's home where they met Carl McAfee. Garcia relayed to McAfee what had transpired at the motel. McAfee expressed reservations about transacting business at a motel. Based on McAfee's concern, Garcia stopped the deal.

On July 28, 1995, Garcia contacted Betancourt to reorganize the transaction. Garcia went to Betancourt's apartment and again said that he wanted to purchase ten kilograms of cocaine. Betancourt told Garcia that her supplier would be in town on August 1. Garcia reassured Betancourt that he would have the money to buy ten kilograms. On August 1, 1995, Garcia returned to Betancourt's apartment. Betancourt informed Garcia that he had to produce the requisite funds before he would be allowed access to the cocaine. Garcia left, and returned with McAfee. McAfee said that they would purchase four kilograms first, and then three more only after his associates had inspected the first four. Initially Betancourt resisted, renewing her claim that her suppliers wanted her to sell fifteen kilograms. However, Garcia and McAfee held firm at seven. After Betancourt agreed, McAfee delivered to Betancourt money for three kilograms, then left to pick up money for the fourth kilogram.

Police entered Betancourt's apartment after McAfee left, where they found Betancourt, Garcia, over $60,000 in cash, and handwritten calculations of the profit margin on seven kilograms of cocaine. Law enforcement agents then surveilled Betancourt's apartment and awaited McAfee's return. Officers stopped McAfee in his car near Be-

tancourt's apartment. In McAfee's car the officers found, among other things, money to purchase a fourth kilogram.

On August 8, 1995, McAfee and Garcia were indicted. Count One charged both men with conspiracy to possess with the intent to distribute more than five kilograms of cocaine, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1) and 846. Count Two charged McAfee with knowingly and intentionally possessing with the intent to distribute cocaine, in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1). Count Three charged both Garcia and McAfee with knowingly and intentionally attempting to possess with the intent to distribute cocaine, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1) and 846. McAfee pleaded guilty to Count One, but reserved the right to challenge the amount of cocaine attributable to him as relevant conduct at sentencing. Garcia proceeded to a jury trial where he was convicted on Counts One and Three.

On December 15, 1995, the district court held a sentencing hearing where it determined that the relevant conduct as to both McAfee and Garcia involved seven kilograms of cocaine, and that Garcia was a career criminal. McAfee was sentenced to 166 months. Garcia received 360 months for Count One and 240 months for Count Three, to run concurrent. McAfee and Garcia now bring these timely appeals. We have jurisdiction pursuant to 28 U.S.C. § 1291.

**II.**

**A. The sufficiency of the evidence.**

■ First, Garcia contends that the evidence introduced at trial was insufficient to convict him of Count One, conspiracy to possess with the intent to distribute cocaine. When reviewing a challenge to the sufficiency of the evidence, we consider the evidence in the light most favorable to the government to determine whether any rational fact-finder could have returned a guilty verdict. *United States v. Williams*, 61 F.3d 534, 535 (7th Cir.1995). Viewing these facts through the government's lens, we disagree with Garcia.

---

1. Garcia purported to represent a gang based in      Milwaukee.

Garcia argues that the evidence at trial proves that at most he was a "buyer/seller," not McAfee's co-conspirator. Garcia rests his sufficiency argument on our holding in *United States v. Lechuga*, 994 F.2d 346 (7th Cir.), *cert. denied*, 510 U.S. 982, 114 S.Ct. 482, 126 L.Ed.2d 433 (1993). In *Lechuga*, a government agent sought to buy cocaine from a man named Pinto. *Id.* at 346. To acquire the cocaine, Pinto turned to Pagan. *Id.* Pagan then contacted Lechuga. *Id.* Lechuga arranged to sell the drugs to Pagan in an apartment building; Pinto and the government agent attended the sale. *Id.* at 346–47. Lechuga was arrested, tried, and convicted for, among other things, conspiring with Pinto to distribute the cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. *Id.* at 346.

On appeal, Lechuga argued that the only evidence that he conspired with Pinto was that he sold to Pinto a quantity of drugs too large for Pinto's personal use. *Id.* at 347. That evidence, Lechuga contended, was insufficient to prove that Pinto and Lechuga actually conspired to commit a crime—there was no evidence that Lechuga and Pinto agreed to commit any crime beyond Lechuga's sale of the drugs to Pinto. Our court, sitting en banc, agreed, holding that "[w]hat is necessary ... is proof of an agreement to commit a crime other than the crime that consists of the sale itself." *Id.* We reasoned that:

> When the sale of some commodity, such as illegal drugs, is the substantive crime, the sale agreement itself cannot be the conspiracy, for its has no separate criminal object. What is required for conspiracy in such a case is an agreement to commit some other crime beyond the crime constituted by the agreement itself.

*Id.* at 349. In other words, we held that a sale agreement cannot constitute a conspiracy when the sale itself is the conspiracy's substantive crime.

■ Garcia argues that Betancourt was the "seller," McAfee was the "buyer," and that Garcia was only the broker between the two. Garcia maintains that because he only bought drugs from Betancourt to sell to McAfee, his collaboration with McAfee can-

not constitute a conspiracy. Garcia simply misreads *Lechuga*. On the facts of this case, *Lechuga* stands only for the proposition that Garcia's attempted purchase from Betancourt in and of itself cannot constitute a conspiracy between Betancourt and Garcia. Cf. *United States v. Baskin–Bey*, 45 F.3d 200 (7th Cir.) (holding that *Lechuga* is inapplicable when the alleged coconspirators are on the same side of the transaction), *cert. denied*, —— U.S. ——, 115 S.Ct. 1809, 131 L.Ed.2d 734 (1995). Garcia's agreement with McAfee to purchase drugs from Betancourt for distribution by McAfee does constitute a conspiracy under *Lechuga*. *Id.*

Count One, in relevant part, charged Garcia and McAfee with conspiracy to possess with the intent to distribute cocaine. The facts of this case make clear that Garcia collaborated and cooperated with McAfee to purchase cocaine from Betancourt. There is also ample evidence that the duo attempted to acquire the drugs with the intent that McAfee would resell them. For example, Garcia's conduct throughout his negotiations with Betancourt suggests that he was McAfee's agent, not an independent buyer. Garcia represented himself to Betancourt and government investigators as an agent for other buyers. Garcia regularly consulted with McAfee, and followed McAfee's advice to abandon the purchase at the motel. Garcia accompanied McAfee when McAfee told Betancourt that they would only purchase four kilograms first, so that McAfee's "associates" could inspect the drugs. Garcia helped McAfee to coordinate the delivery of over $90,000 in cash to purchase the cocaine. McAfee even concedes in his appellate brief that "[d]uring the course of the negotiations at the informant's house ... the parties discussed amounts that would be purchased by Garcia and McAfee on behalf of the undisclosed buyers." This case satisfies the very definition of conspiracy that we outlined in *Lechuga*: "an agreement to commit some other crime beyond the crime constituted by the agreement itself." *Id.* at 349.

The record demonstrates that Garcia, in conjunction with and on behalf of McAfee, repeatedly attempted to purchase cocaine from Betancourt. There is substantial evi-

dence from which a rational trier of fact could conclude that Garcia and McAfee agreed to purchase cocaine for McAfee to distribute to subsequent purchasers. Garcia's sufficiency claim necessarily fails as to Count One.

Garcia also argues that the evidence at trial was insufficient to support his conviction on Count Three. In his appellate brief, Garcia objects that "[i]n the instant case, the primary fact upon which the attempt charge is premised is, strictly speaking, an impossibility." The cornerstone of Garcia's objection appears to be that "there was no available cocaine to be sold to anyone." Garcia's point is that Betancourt, in cooperation with the police, never actually had cocaine to sell. Therefore, according to Garcia, "the factual scenario becomes so attenuated ... that the government's case must be dismissed for lack of evidence."

■ Garcia's argument is strange indeed. This is a case about attempting to possess drugs, not actual possession of drugs. Garcia cites no authority for the proposition that the government actually had to possess real cocaine to convict him of attempting to possess cocaine. Garcia's omission is not surprising; our research has revealed no such authority. To the contrary, the government regularly secures convictions for attempted possession without actually having proffered to the defendant real cocaine. Cf. *United States v. Young*, 20 F.3d 758, 760 (7th Cir. 1994) (upholding a conviction for attempted possession of cocaine where the government employed "mock" packages of cocaine during the investigation). The question is whether Garcia believed that he actually was buying cocaine. Considerable evidence suggests that Garcia believed just that. Therefore, Garcia's sufficiency claim fails as to Count Three.

## B. The "career offender" determination and due process.

The district court classified Garcia as a career offender for sentencing purposes pursuant to United States Sentencing Guideline § 4B1.1. Garcia argues that the classification violated his Fifth Amendment right to due process of law. Reviewing Garcia's legal ob-

jection *de novo*, we conclude that Garcia's argument has no merit.

In June of 1972 a federal court sentenced Garcia to six years' imprisonment for conspiracy to possess with the intent to distribute heroin. He was paroled in September of 1974. In January of 1976, the United States Parole Commission issued an arrest warrant for Garcia, charging him with the sale of heroin while on parole. In October of 1977, a Michigan state court convicted Garcia for selling heroin, and sentenced Garcia to thirteen to twenty years' imprisonment. In March of 1978, in the wake of Garcia's state court conviction, the Parole Commission filed a supplemental warrant. Garcia's parole was revoked on October 1, 1978. On July 13, 1981, Garcia was paroled again, with his parole term to expire on January 11, 1982.

Sentencing Guideline § 4B1.1 provides that a convicted criminal is a career offender for sentencing purposes if: 1) the criminal was at least eighteen years of age at the time of the instant offense; 2) the instant offense is a crime of violence or a controlled substance offense; and, 3) the criminal has at least two prior felony convictions of either crimes of violence or controlled substance offenses. Sentencing Guideline § 4A1.1 provides that a sentence imposed more than fifteen years prior to the date of the instant offense is not counted for the purposes of § 4B1.1 unless the criminal's incarceration extended into the fifteen year period. Pursuant to Sentencing Guideline § 4A1.2(e)(1), Garcia's parole date of July 13, 1981 rendered Garcia's 1972 heroin conviction within the scope of § 4B1.1.

■ Garcia objects that to include his 1972 offense as a controlled-substance conviction under § 4B1.1 denies Garcia his Fifth Amendment right to due process because if "[Garcia's] parole had been revoked in 1976, he would not have fallen within the fifteen (15) year period." In other words, Garcia cries a violation of due process because the judicial system waited from 1976 until 1978 to revoke Garcia's parole, and that delay adversely affected his sentence in 1995. Again Garcia offers us a novel argument, without any citation to supporting authority.

And like before, the reason for Garcia's omission is clear: there is no authority for the proposition that he asserts. Essentially Garcia objects that he is a victim of happenstance. The fallacy of Garcia's argument is obvious. When Garcia violated his parole, the violation was not the result of arbitrary government treatment. Nor was the parole violation the result of Garcia's fortune or misfortune. Garcia consciously chose to violate his parole and to commit the instant offenses. Garcia was unlucky in that he was caught both in 1976 and in 1995. But a criminal's misfortune in being caught by the government is hardly tantamount to a deprivation of due process. Nor does the government's delay in revoking Garcia's parole in 1978 work a deprivation of due process in 1995. To hold otherwise would require courts to be omniscient; something we are not inclined to do. Further, we are not aware of any due process right to a speedy parole revocation.

Garcia was sentenced based on accurate information. The sentencing procedure employed by the district court was fair. On the facts of this case, that is all that the Fifth Amendment requires. *See United States v. Knorr,* 942 F.2d 1217, 1221 (7th Cir.1991).

## C. Outrageous government conduct.

■ Garcia also argues that his convictions should be set aside because the government engaged in "outrageous governmental misconduct." It is impossible to garner the basis for Garcia's objection from his brief. Garcia fails to specify exactly what aspect of the government's conduct is outrageous. He merely states that "[t]he government's conduct in the instant case is outrageous because of its cynical contempt for the role of law enforcement in an advanced society." Garcia offers this pithy argument in the face of a formidable legal obstacle: our circuit has expressly refused to recognize the doctrine of "outrageous governmental conduct." *United States v. Boyd,* 55 F.3d 239, 241 (7th Cir. 1995). Garcia has offered us no reason to revisit that decision.

## D. The sentencing responsibility determination.

■ Pursuant to United States Sentencing Guideline § 2D1.1, the district court found that Garcia and McAfee each should be held responsible for seven kilograms of cocaine as relevant conduct for sentencing purposes. Both Garcia and McAfee challenge the district court's determination, arguing that the evidence suggests that at most they intended to purchase four kilograms of cocaine. Reviewing the district court's factual determination for clear error, *United States v. Cea,* 963 F.2d 1027, 1030 (7th Cir.), *cert. denied,* 506 U.S. 899, 113 S.Ct. 281, 121 L.Ed.2d 208 (1992), we affirm both sentences.

In his appellate brief, Garcia expressly adopted the arguments proffered by McAfee. Therefore, although we will address only McAfee's arguments, our analysis applies equally to both defendants. McAfee contends that "[t]he underlying issue in this case focuses on when the government baits the players during negotiations for the purchase of quantities of drugs above what is intended by the buyer." Although McAfee's argument sounds like a "sentencing entrapment" theory, McAfee wisely has waived sentencing entrapment. *Cf. United States v. Okey,* 47 F.3d 238, 240 (7th Cir.1995) (expressing skepticism about the viability of "sentencing manipulation"). Rather he argues that the only reason that either he or Garcia agreed to purchase seven kilograms was because the government's informant repeatedly insisted that they buy fifteen kilograms. McAfee appears to argue that the various representations made to Betancourt were no more than braggadocio, offered in an attempt to placate Betancourt's insistence that McAfee and Garcia buy a larger sum of cocaine. *See United States v. Ruiz,* 932 F.2d 1174, 1184 (7th Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 151, 116 L.Ed.2d 116 (1991).

We need not consider McAfee's argument at length, because the record directly contradicts McAfee's position. From almost the very beginning of his negotiations with Betancourt, Garcia—in concert with McAfee—said that he would buy ten kilograms of cocaine. Garcia clearly represented McAfee and his associates during the negotiations. McAfee obviously knew how much cocaine Garcia had committed to buy. When Betanc-

ourt attempted to persuade Garcia to buy fifteen kilograms, Garcia held his ground at ten. Only when it was time to buy the drugs did either Garcia or McAfee suggest that they would buy seven as opposed to ten kilograms. No evidence suggests that McAfee was incapable of purchasing the seven kilograms.[2]

The fact that McAfee only produced enough funds to buy four kilograms is of no import on this record. McAfee said that he was buying four with the commitment to buy an additional three pending approval by his associates of the quality of the cocaine. Most of the details surrounding the purchase of the additional three kilograms were determined, subject only to the approval of McAfee's buyers. *See United States v. Skinner,* 986 F.2d 1091, 1094 (7th Cir.1993); *United States v. Macias,* 930 F.2d 567, 570 (7th Cir.1991). McAfee's explanation for limiting his initial purchase to four kilograms is entirely plausible, and suggests an earnest intention to buy all seven kilograms of cocaine. *See United States v. Jean,* 25 F.3d 588, 598 (7th Cir.1994). What is more, the ease with which McAfee produced the money to make the initial purchase strongly suggests that he intended to, and was capable of, fulfilling his commitment to buy seven.

Nothing suggests that either McAfee's or Garcia's statements were mere braggadocio. The district court found both McAfee and Garcia responsible for seven kilograms of cocaine. There is more than enough evidence to support the district court's finding.

### Conclusion.

For all of the foregoing reasons the convictions of Miguel Garcia and the sentences of Miguel Garcia and Carl McAfee are

AFFIRMED.

---

2. As we noted above, government agents found handwritten calculations of the profit margin on seven kilograms of cocaine when they entered Betancourt's apartment.